DECISION AND JUDGMENT ENTRY
This appeal comes to us from a judgment issued by the Erie County Court of Common Pleas. There, appellant, following the return of a jury verdict, was found guilty of murder, evidence tampering, child endangering, and complicity to possession of crack cocaine. Because we conclude that the trial court committed no reversible error, we affirm.
In November 1998, the Erie County Grand Jury indicted appellant, Jason Krawetzki, on four counts: murder, a violation of R.C. 2903.02 (with specification of causing or threatening to cause physical harm while committing the offense); tampering with evidence, a violation of R.C.2921.12; child endangerment, a violation of R.C. 2919.22; and complicity to possession of crack cocaine, a violation of R.C. 2925.11 and 2923.03. The indictment stemmed from incidents surrounding the death of nearly three-year-old Skyler Keegan, son of appellant's girlfriend, Bobbi Crispen.
Appellant pled not guilty to all counts in the indictment. He also moved to suppress evidence found in connection with the search of the child's room. After a hearing on the matter, the court denied appellant's motion to suppress and the matter was eventually tried before a jury.
At trial, the following evidence was presented. Several EMT/firemen, including Fire Chief Thomas Kimer, testified that at approximately 4:00 p.m. on November 16, 1998, they arrived at a trailer occupied by appellant and his girlfriend, Bobbi Crispen. The squad responded to a 9-1-1 call from Crispen that her son was choking. The firemen entered the bedroom and found the child's body — cold and pale, with no heartbeat. The firefighters intubated the child, observing that nothing was blocking his airway. While the firefighters engaged in resuscitation efforts, appellant appeared highly agitated and distraught. He grabbed one of the firemen, spun him around, and yelled "is my baby going to die," and "is he going to be all right?" Appellant was admonished to leave the firefighter alone so that he could do his job.
The firefighters worked on the child for approximately nine minutes and then transported him to a nearby hospital. On the way to the hospital, Chief Kimer rode in the ambulance, facing the rear door windows. The chief said he became concerned when he saw Crispen and appellant, who was driving their vehicle, following too closely to the ambulance. Chief Kimer then watched the vehicle swerve to the right side of the street, go up over a curb, and almost hit a telephone pole. At the same time, Chief Kimer observed appellant with his arm drawn back as if throwing a punch, and Crispen cowering in the corner of the seat near the door.
Sergeant Burt J. Manley assisted when Skyler was brought into the hospital. Manley testified that he directed appellant and Crispen to sit in a nearby conference room because they were disruptive and hindered the efforts of the trauma team. Both Crispen, who was crying, and appellant appeared to be extremely upset. Sergeant Manley instructed another deputy to keep them in the room to prevent further interference. The trauma team unsuccessfully attempted to resuscitate Skyler. Sergeant Manley then called Sergeant Paul Sigsworth, from the sheriff's detective division, to the hospital. Sergeant Sigsworth began to interview appellant and Crispen, but stopped when hospital staff asked everyone to vacate the waiting room.
Crispen, who was meeting with her family, needed a vehicle so that she could return home at a later time. Sergeant Sigsworth, observing that appellant appeared to be extremely upset and distraught, offered to have Sergeant Manley drive him back to the trailer, since Crispen would have the vehicle. Arriving at the trailer between 5:30 to 6:00 p.m., the officers and appellant were met by a deputy and two representatives from Erie County Children Services, including Investigator Aaron Volz. Everyone went inside the trailer.
Inside the trailer, appellant and Sergeant Sigsworth sat down and talked about what happened. After several minutes of discussion, the sergeant asked appellant to sign a waiver of search form to permit the deputies to search Skyler's bedroom. Appellant expressed concern about having some "rolling papers," but agreed to sign after Sergeant Sigsworth stated that he was not concerned with those items. Appellant then led the sergeant and others to the bedroom.
Sergeant Sigsworth entered first and noticed a silver object which he recognized as a "crack pipe" lying on the bed. Appellant immediately grabbed the object and ran out of the room and down the hall to the bathroom. As the deputies ran after him, yelling for him to stop, they heard the toilet flush.When appellant exited the bathroom, Sergeant Sigsworth announced that he was under arrest for tampering with evidence. Appellant resisted, briefly struggling as the deputies put handcuffs on him. Appellant then said he wanted to revoke the consent to search. Sergeant Sigsworth said "ok," telling appellant that he would be taken to jail and the deputies would obtain a search warrant. At that point, appellant then told the officers to go ahead and search the trailer. Investigator Volz and Sergeant Sigsworth both took photos of Skyler's room. The sergeant talked with appellant a little longer and then had him transported to jail.
Later, while Sergeant Sigsworth and Investigator Volz were still outside the trailer, Crispen returned to pick up some clothing. She consented to a search of the master bedroom where some drugs and drug paraphernalia were found. Crispen stated that she was going to stay at her mother's home that night. Sergeant Sigsworth arranged for Crispen to come to the sheriff's office the next morning for an interview.
The next day (November 17, 1998), Crispen came in and consented to a search of the entire trailer. She also voluntarily submitted a urine sample for drug testing. Crispen said, in a statement given to Sergeant Sigsworth, that she woke up at approximately 1:00 p.m. the previous day, and cleaned the trailer because potential purchasers were coming to view it. Crispen initially said that around 3:00 p.m. Skyler had gotten up to go to the bathroom and complained that his "belly button hurt." Crispen put the child back to bed. Appellant returned home around 3:45 p.m., and found the child dead.
Crispen later said that Skyler had not gotten up at 3:00 p.m. She said she lied at first so that the deputies would think that she was a good mother. Crispen also initially stated that she smoked marijuana only twice a month. After drug tests showed positive, she admitted that she used marijuana daily and cocaine four to five times per week. She stated that appellant was her source for cocaine.
Crispen also said that she wanted to leave appellant the week prior to the incidents, but he threatened and assaulted her. Crispen said that when appellant was going through crack withdrawal, he would become agitated, "aggravated," and would make numerous phone calls in search of a source for crack. Sergeant Sigsworth stated that Crispen was ultimately charged with involuntary manslaughter and child endangering.
Later that day, Sergeant Sigsworth conducted a complete search of the trailer. Crispen volunteered information as to where appellant had hidden drugs in the residence. As a result of that search, a substance was discovered which was later determined to be three-tenths of a gram of crack cocaine.
Also on November 17, 1998, Sergeant Sigsworth met with appellant, who was still in custody, and advised him of his Miranda rights. Appellant waived those rights and participated in an interview conducted by Sergeant Sigsworth and Detective Robert Lippert. During the interview, appellant stated that on November 16, 1998, at about 1:00 a.m., he woke and carried Crispen, who had fallen asleep in the living room, to bed. Appellant said he then went to bed and woke up around 9:30 a.m. Skyler, who had been sleeping in the living room, also awoke. Appellant said he gave Skyler a bath and then fixed him cornflakes for breakfast. Skyler played by himself for the rest of the morning. Sergeant Sigsworth noted that appellant was vague about any details of his actions while Skyler played.
At 1:00 p.m., appellant woke Crispen and then left the trailer. He stated later in the interview that, before he left, he and Crispen had fought. He said he stopped at a restaurant and called her from a pay phone to apologize. He then went to a friend's home, took the friend to a cash advance store, and then dropped him off at a grocery store. Appellant later returned to the store, picked him up and took him home. Appellant said he next went to a second friend's home and the two went to a third person's house. After a few minutes, appellant took the second friend home and returned home around 3:40-3:45 p.m.
Appellant also admitted during the interview that he and Crispen were heavy users of crack cocaine. He stated that the crack pipe had fallen from his coat pocket onto Skyler's bed. On November 17, 1998, appellant refused the sergeant's request for a blood test. He admitted, however, that he was going through crack withdrawal. After obtaining a warrant, a blood sample was drawn on November 18, 1998, which tested negative for cocaine. Appellant also stated that Crispen loved her child, and he did not believe that she had abused Skyler.
Sergeant Sigsworth also testified as to phone records from appellant's home. He stated that despite appellant's assertion that he and Crispen went to bed at 1:00 a.m. on November 16, ten phone calls were made from the trailer between 1:47 a.m. and 2:29 a.m. Two more calls were made at 5:08 a.m. and 5:09 a.m.
Detective Robert Lippert then testified regarding the November 17 search of the trailer. He corroborated that Crispen pointed out where appellant kept drugs and that a bag of crack cocaine was found in the trailer. Detective Lippert admitted that after Skyler was taken in the ambulance, the trailer was never secured as a crime scene. He also stated that on November 26, 1998, he received a slip of paper from Vernard Englehart, then an inmate in the Erie County jail. As a result of that development, Detective Lippert interviewed Englehart and recorded it on micro cassette, which was admitted into evidence.
Vernard Englehart then testified that he had been a cell-mate with appellant for two weeks in the Erie County jail. At one point, appellant told him he was on "crack" much of the time. Englehart stated that appellant would "try out" different versions of his story of what happened, allegedly to find a way to have the charge lowered from murder to manslaughter. Eventually, appellant suggested the following scenario. Englehart said that appellant allegedly doubled up his fist and said, "let's say I just hit, you, the child in the belly." Appellant, who was sitting across from Englehart, then allegedly made a swinging motion at Englehart's stomach, and said, "I just hit the child in the stomach."
Shocked by the statement, Englehart questioned appellant as to why he would hit a child in the stomach. Englehart then expected appellant to deny actually hitting Skyler and to say that he was just making up the story. Instead, appellant allegedly became excited and responded by saying that he was not angry at the child, but had been angry at Bobbi Crispen. According to Englehart, appellant then acted "really intense" and said, "You can't tell me that you have never got mad and wanted to just hurt a child before."
Upset by appellant's statements, Englehart stated he then sent a note to the prosecutor. He said that he did not utilize the information to negotiate a "deal" for his own case, nor did any other plea agreements occur because of his testimony. On cross-examination, appellant admitted to a more than twenty-year-old conviction for providing false information to police. He also acknowledged that he was currently serving a sentence for domestic violence and abduction. He admitted being depressed while in the jail with appellant, having attempted suicide while awaiting trial. He said he talked with another inmate, Bret Korotney, but only in general conversations.
Englehart stated that Detective Lippert interviewed him about what appellant had said. Englehart also acknowledged that when talking earlier with appellant's attorney he had not remembered to tell him what appellant had said about being on crack. Over appellant's objections, the videotaped interview between Englehart and Detective Lippert was played for the jury.
Dr. Diane Barnett, deputy coroner and forensic pathologist, testified that Skyler had bruises and abrasions on his forehead, face, arms, abdomen and back. The bruises on the abdomen indicated that Skyler had been punched once or twice in the belly. Dr. Barnett acknowledged that the punches could have been inflicted by an average sized female. She stated that Skyler suffered internal abdominal bleeding from tears in the mesentery bowel and mesentery artery. According to Dr. Barnett, the bruising on the child's spine was sustained by the child's body being lodged against a hard surface, like a floor or wall, at the time of the punching. She said that all fifteen bruises and abrasions were recent injuries and were not caused by some accidental event such as a fall.
Dr. Barnett opined that the abdominal blunt force injury was the cause of Skyler's death. She also testified that Skyler would have lived approximately an hour after the abdominal injuries were inflicted. The doctor said that the child also would have suffered a great deal of pain.
Dr. James Patrick, Lucas County Coroner and pediatric pathologist, also testified as to the autopsy results. He stated that he reviewed the data from various tests performed relating to body temperature, a vitreous potassium test, lividity, and rigor mortis. Dr. Patrick said that the vitreous potassium test indicated that Skyler's time of death was approximately 9:30 a.m. Using body temperature, the time of death could have been as early as 8:30 a.m. Dr. Patrick testified that the absence of rigor mortis, however, placed the time of death after 12:00 or 1:00 p.m. Finally, the doctor said that lividity, the settling of blood in the body, set in within three to four hours of death. Dr. Patrick stated that lividity, which was evident in Skyler's body, occurs only after death.
Considering all the results together, Dr. Patrick opined that when Skyler arrived in the emergency room he had been dead longer than three hours. He acknowledged that the results from the various tests were in comparison with charts that had been made using adult bodies. Dr. Patrick also conceded that the test comparisons might vary somewhat for a child.
Over appellant's objections, the next witness, Dr. Robert B. Forney, then testified as to the effects of use and withdrawal from cocaine and crack cocaine on an addicted person. Dr. Forney said that when a person uses cocaine, it produces a stimulating chemical effect in the brain that creates the "high." He stated that, depending on dosage and frequency of use, when a crack cocaine user is not using, they become depressed, irritable, and exhausted, with interference in sleep patterns. Chronic use of "crack," according to Dr. Forney, also may cause psychotic behavior, such as paranoid delusions, increased irritability and violence.
Dr. Forney stated that cocaine is easier to detect using urine tests than a blood test. Residual chemicals which result only from cocaine usage can be detected in urine two to three days after usage. Cocaine breaks down quickly, however, in the bloodstream, and is not detectable six to twelve hours after usage. He noted that a blood test performed forty-eight hours after a person had used crack would not reveal cocaine usage. Dr. Forney then stated that a urine test was performed on a sample provided by Bobbie Crispen on November 17, 1998, the day after Skyler's death. The test results showed that she had a substantial amount of cocaine in her system, indicating recent usage.
The final state's witness was Latonya Johnson who also testified over appellant's objections. Johnson, then an inmate at Marysville Women's Prison, stated that she was serving time for forgery, complicity to theft, and receiving stolen property for writing bad checks. While awaiting arraignment on those charges, Johnson had been placed in a holding cell with Bobbi Crispen. During their wait, Crispen revealed certain details of the incidents on the day Skyler died. After this conversation, Johnson stated that she sent a statement to the prosecutor's office about what Crispen had told her.
At trial, Johnson read the following part of this statement into the record: "She also said that they were both on crack cocaine together." Johnson said that no plea agreements were made in conjunction with her testimony at both Crispen's trial and appellant's. Johnson, the mother of two small children, stated that she was testifying "[b]ecause of the little boy, justice done for that little boy." She acknowledged that she had been incarcerated two previous times for a theft offense and an escape charge. Johnson also stated that despite no opposition from the prosecutor's office, her motion for judicial release had been denied. The state then rested.
Appellant moved for acquittal. The motion was denied. Appellant then called as his first witness, Brett Korotney. Korotney testified that he had also been an inmate in the Erie County jail with appellant and Vernard Englehart. Korotney stated that Englehart had allegedly said he was lying about the conversation with appellant. According to Korotney, Englehart lied in order to gain favor with the prosecutor's office and to get himself out of trouble. Korotney acknowledged that appellant's current trial counsel had also represented him at that time. Korotney also testified that during that case, he had pled not guilty by reason of insanity due to mental incompetency. He admitted that since he was eight years old he had heard "voices" that told him to do a variety of things. Korotney admitted that he had never contacted any authorities about Englehart's alleged perjury. Eventually Korotney told his attorney, appellant's trial counsel, that Englehart allegedly said he was lying.
Next, appellant's mother, Sharon Paisley, testified. Paisley said she and her husband lived next door to and owned the trailer where appellant and Bobbi Crispen were living. She stated that appellant, age twenty-nine, had a young son, also named Skyler. Paisley testified that he had a good relationship with and often played with his son. She acknowledged that a condition of visitation was that appellant's son was to stay with her when he came for visits with appellant. Appellant was also not permitted to take his son anywhere in a vehicle. Paisley testified that appellant also had a good relationship with Skyler Crispen, playing and spending time with him at the trailer.
Paisley said that on November 16, 1998, she and her husband left for a doctor's appointment at approximately 1:20-1:30 p.m. She stated that appellant's car was not in his driveway at that time. When they returned home at approximately 3:00 p.m., appellant's car was still not in the driveway. Paisley then went over to check on Crispen's cleaning of the trailer; she entered the trailer through the back door. As she opened the door to Skyler's room, she observed that he appeared to be sleeping. She then went into the living room and talked a few minutes with Crispen who had been playing a video game. Paisley asked Crispen why Skyler was laying up against the wall by his bed. Crispen said that the room was very hot. Paisley acknowledged the fact that Skyler's room was one of the hottest rooms in the trailer. She showed Crispen how to put a rug on the vent to help cool down the room. Paisley said she then left and went back to her trailer.
A short while later, Paisley heard Crispen crossing the yard, upset and screaming that the baby was not breathing. Paisley testified that she followed her husband over to the trailer where she saw appellant attempting to perform CPR on Skyler. Distraught, Paisley then left and did not return. She stated that appellant appeared to be emotionally upset and crying when he later came out of the trailer. Crispen was also still crying and upset, according to Paisley. Paisley denied that appellant acted violently; however, she later made a taped statement to Deputy Sigsworth stating that she was upset because she did not know that appellant was "back on crack cocaine." A portion of that statement was later played for the jury.
Lois Holbrook, the maternal grandmother of appellant's natural son, then testified that her daughter, Shelley Feindel and appellant's son resided with her. Holbook testified that appellant had been good to Shelley and their son, visiting every other weekend. According to Holbrook, appellant cared for his son, taking him to an amusement park and the zoo. She stated that she was never concerned about her grandson's safety when he was with appellant. Holbrook said that she did not know appellant had a drug problem and had never witnessed any signs of aggressive or violent behavior. Shelley Feindel also testified briefly that appellant had developed a relationship with their son who was then three and a half years old.
The final witness, Dr. Gerald T. Gowitt, a forensic pathologist from Georgia, testified as to Skyler's time of death. Dr. Gowitt discussed the various methods of determining time of death: body temperature, vitreous potassium level in eye fluid, lividity, stomach contents and rigor mortis. Dr. Gowitt reviewed the test results and the autopsy reports for Skyler. He agreed that Skyler's death was the result of abuse and that an average-sized male or female could have inflicted the injuries to Skyler. He stated, however, that the tests used to determine time of death were often not very accurate or reliable. Dr. Gowitt noted that the skin of a living person, in shock, feels cool and clammy. According to Dr. Gowitt, lividity could set in during the last fifteen to twenty minutes of a person's life because of decreased blood pressure. He also stated that no rigor mortis was noted by any of the emergency persons or medical personnel. In his opinion, this indicated that Skyler's death occurred later in the day, rather than earlier.
After evaluating the data he was given, Dr. Gowitt opined that, because Skyler was a child, there were too many variables to provide a reliable calculation of his time of death. He testified that ultimately, even after considering all the factors, he could not state with a reasonable degree of medical certainty how long Skyler had been dead at the time that he was brought to the emergency room. On cross-examination, Dr. Gowitt agreed that a very warm room temperature and clothing on the body would have affected how quickly it cooled. He also acknowledged that rigor mortis could set in more slowly in a child. At this point, appellant rested and, once more, moved for acquittal, pursuant to Crim.R. 29. The trial court again denied the motion.
On rebuttal, the state recalled Chief Thomas Kimer. He stated that he arrived at the trailer at approximately 3:38 p.m. Chief Kimer stated that Skyler was clothed when he received emergency treatment and remained clothed until he was in the trauma room at the hospital. Chief Kimer also stated that when he touched Skyler's face, his skin felt ice cold, not cool and clammy as it would if he had been in shock. The chief stated that he was surprised, since, in his opinion, Skyler should have been much warmer if, as reported, he had been "down" for only about thirty minutes.
After hearing the closing arguments and receiving their instructions, the jurors retired for deliberations. The jury found appellant guilty on all four counts and appellant was sentenced as to each.
Appellant now appeals, setting forth the following nine assignments of error:
 "ASSIGNMENT OF ERROR #1: THE APPELLANT'S SIXTH AMENDMENT RIGHT TO CONFRONT AND CROSS EXAMINE WITNESSES AGAINST HIM WAS VIOLATED BY THE TRIAL COURT'S ADMISSION OF HEARSAY EVIDENCE.
 "ASSIGNMENT OF ERROR #2: THE COURT COMMITTED REVERSIBLE ERROR BY PERMITTING THE PROSECUTOR TO PLAY AN AUDIO TAPED STATEMENT OF TRIAL WITNESS VERNON ENGLEHART AS A PRIOR CONSISTENT STATEMENT.
 "ASSIGNMENT OF ERROR #3: THE COURT ERRED BY PERMITTING LATONYA JOHNSON TO READ AN EXCERPT FROM A LETTER SHE WROTE THE PROSECUTOR REGARDING AN ORAL STATEMENT ALLEGEDLY MADE TO HER BY BOBBI CRISPEN.
 "ASSIGNMENT OF ERROR #4: THE TRIAL COURT ERRED BY PROVIDING THE JURY WITH THE MEANS TO REPLAY THE AUDIO TAPE OF A STATEMENT MADE BY VERNARD ENGLEHART DURING DELIBERATIONS.
 "ASSIGNMENT OF ERROR #5: THE APPELLANT'S CONVICTIONS FOR MURDER AND CHILD ENDANGERING WERE CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.
 "ASSIGNMENT OF ERROR #6: APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL DENYING HIM HIS FIFTH AMENDMENT RIGHT TO COMPETENT COUNSEL AND RESULTING IN AN UNFAIR TRIAL IN WHICH HE WAS WRONGFULLY CONVICTED.
 "ASSIGNMENT OF ERROR #7: THE TRIAL COURT ERRED BY FAILING TO GRANT THE APPELLANT'S MOTION TO SUPPRESS FOR THE REASON THAT THE CONSENT TO SEARCH SIGNED BY APPELLANT WAS NOT OBTAINED VOLUNTARY [SIC].
 "ASSIGNMENT OF ERROR #8: THE TRIAL COURT ERRED BY PERMITTING THE PROSECUTORS TO COMMIT MISCONDUCT DURING CLOSING ARGUMENTS.
 "ASSIGNMENT OF ERROR #9: THE APPELLANT'S SIXTH AMENDMENT RIGHT TO CONFRONT AND CROSS EXAMINE WITNESSES AGAINST HIM WAS VIOLATED BY THE TRIAL COURT'S ADMISSION OF HEARSAY EVIDENCE GIVEN BY THE EMERGENCY ROOM PHYSICIAN."
 I.
Appellant, in his first assignment of error, argues that he was denied the right to confront and cross-examine Bobbi Crispen, who invoked her Fifth Amendment right against self-incrimination and thus was unavailable to testify as a witness. Over appellant's objection, the court permitted Deputy Sigsworth to testify regarding Crispen's statements made during the interview with him. Specifically, appellant objects to Crispen's description of his previously exhibited crack withdrawal symptoms because no evidence was presented that Crispen knew he was in withdrawal on the day of the murder.
Evid.R. 804(B)(3) provides in pertinent part:
"(B) Hearsay exceptions.
 "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
"* * *
 "(3) Statement against interest. A statement that * * * at the time of its making * * * so far tended to subject the declarant to civil or criminal liability, * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."
Relying upon Lilly v. Virginia (1999), 527 U.S. 116, the Supreme Court of Ohio has held that an accomplice's confession that inculpates a criminal defendant is not admissible as being within a firmly rooted exception to the hearsay rule as that concept has been defined by Confrontation Clause jurisprudence. State v. Madrigal (2000),87 Ohio St.3d 378, paragraph two of the syllabus. Instead, hearsay statements may be admitted as sufficiently reliable "without the benefit of cross-examination when the statements * * * (2) contain adequate indicia of reliability. (Ohio v. Roberts [1980], 448 U.S. 56, 66 * * * followed.)" Madrigal, supra, paragraph one of the syllabus. Therefore, "out-of-court statements made by an accomplice that incriminate the defendant may be admitted as evidence if the statement satisfies the second prong of the test announced in Ohio v. Roberts, supra."Madrigal, supra, paragraph three of the syllabus. In order to satisfy the Confrontation Clause, such statements must contain "particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to the statements' reliability."Lilly v. Virginia, supra, at 125.
In this case, Crispen's statements are admissible at appellant's trial only if they exhibited a guarantee of trustworthiness or indicia of reliability or if corroborating circumstances indicate the trustworthiness of the statement. Upon a careful review of the record, it is undisputed that Crispen lied several times about the events on the day of Skyler's death. Thus, we cannot say that the statements as told to Deputy Sigsworth by themselves demonstrate "truthfulness * * * so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility." See Idaho v. Wright (1990), 497 U.S. 805,820. Therefore, we find that Crispen's statements made to Sigsworth fail to meet the requirements of Madrigal and Ohio v. Roberts and were, thus, improperly admitted into evidence.
Nevertheless, we must now determine whether this error was prejudicial or harmless. To conclude that a federal constitutional error is harmless, this court must be able to declare a belief that the error was "harmless beyond a reasonable doubt." Chapman v. California (1967)386 U.S. 18, 23. Where evidence presented in violation of a constitutional right is merely cumulative and the other evidence is overwhelming, the reviewing court may conclude beyond a reasonable doubt that the denial of the accused's constitutional rights was harmless error. Harrington v. California (1969), 395 U.S. 250, 254.
In this case, appellant admitted to Sergeant Sigsworth that he was a daily crack user and in withdrawal. Moreover, the record reveals appellant's attorney effectively cross-examined the deputy regarding Crispen's credibility, showing that she had lied several times during the investigation. Therefore, we conclude that any error in the admission of Crispen's statements was harmless beyond a reasonable doubt.
Accordingly, appellant's first assignment of error is not well-taken.
 II.
Appellant, in his second assignment of error, contends that the trial court erred in permitting the playing of Vernard Englehart's audiotaped statement.
Evid.R. 801(D)(1)(b) permits the admission of statements made by a witness which are "consistent with his testimony and [are] offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive * * *."
In this case, on cross-examination appellant implied recent fabrication when, at trial, Englehart said he now remembered statements to Detective Lippert about appellant's drug usage that he originally had failed to disclose to appellant's attorney. Appellant also implied that Englehart had lied about appellant's statements in order to get a better plea bargain on his pending offenses. Therefore, the tape, a hearsay exclusion, was properly admitted pursuant to Evid.R. 801(D)(1)(b).
Accordingly, appellant's second assignment of error is not well-taken.
 III.
Appellant, in his third assignment of error, argues that the trial court erred in allowing Latonya Johnson to read part of a letter she wrote regarding an oral statement made by Bobbi Crispen.
An out-of-court statement, whether written or oral, which is offered in evidence to prove the truth of the matter asserted is considered inadmissible hearsay, unless the statement falls within a hearsay exception. See Evid.R. 801, 802.
In this case, Ms. Johnson's prior written statement, an out-of-court statement offered to prove that Crispen was at the trailer and appellant was on drugs the day Skyler died, is inadmissible hearsay. Since nothing indicates that the statement fell within a hearsay exception, the trial court erred in permitting Ms. Johnson to read the statement into the record. Nevertheless, Ms. Johnson was available for cross-examination as to the statement, and appellant himself provided this information to police. Consequently, we conclude that any error was not prejudicial and, therefore, was harmless beyond a reasonable doubt.
Accordingly, appellant's third assignment of error is not well-taken.
 IV.
Appellant, in his fourth assignment of error, claims that the trial court erred in providing the jury with the means to replay the audiotape of a statement made by Englehart.
There is no prejudicial error in the jury's viewing or listening to an exhibit properly admitted into evidence. See State v. Loza (1994),71 Ohio St.3d 61, 79-80; State v. Clark (1988), 38 Ohio St.3d 252, 257. Generally, the propriety of sending such evidence into the jury room rests within the sound discretion of the trial judge. See State v.McGuire, 80 Ohio St.3d 390, 396. In this case, since the tape was properly admitted into evidence, we cannot say that the trial court abused its discretion in allowing the jury to review the tape during its deliberations.
Accordingly, appellant's fourth assignment of error is not well-taken.
 V.
Appellant, in his fifth assignment of error, argues that the convictions for murder and child endangering are against the manifest weight of the evidence.
Under a manifest weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony. State v. Thompkins (1997), 78 Ohio St.3d 380,387. The appellate court,
"`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id., quoting State v.Martin (1983), 20 Ohio App.3d 172, 175.
Additionally, the reversal must be by concurrence of all three judges and the defendant is then granted a new trial. Thompkins, supra at 389.
R.C. 2919.22(A) provides in pertinent part:
 "(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. * * *"
An essential element of the crime of endangering children under R.C.2919.22(A) is the existence of the culpable mental state of recklessness. State v. McGee (1997), 79 Ohio St.3d 193, syllabus. R.C. 2901.22(C) provides:
 "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."
 A "substantial risk" is "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).
R.C. 2903.02(B), murder, provides that:
 "(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."
In this case, appellant admitted that he was a heavy crack user and that on the day of the incident, he was in withdrawal. Evidence was presented that persons in withdrawal from crack cocaine may exhibit paranoid and psychotic, violent behavior. Credible evidence was presented that appellant confessed to punching Skyler in the stomach because he was angry with Bobbi Crispen and just wanted to hurt the child. Finally, evidence was presented that the blows to the stomach caused profuse internal injuries and bleeding which resulted in Skyler's death. Thus, the record supports a finding that appellant acted with reckless indifference towards Skyler, both in inflicting the injury and in then failing to get help for the injured child until it was too late. The record also supports a finding that appellant committed felonious assault which resulted in Skyler's death. Therefore, we cannot say the jury lost its way in finding appellant guilty of child endangering or murder.
Accordingly, appellant's fifth assignment of error is not well-taken.
 VI.
Appellant, in his sixth assignment of error, contends that he was denied effective assistance of counsel.
In order to prove ineffective assistance of counsel, a defendant must show 1) that defense counsel's representation fell below an objective standard of reasonableness and 2) that counsel's deficient representation was prejudicial to defendant's case. State v. Bradley (1989),42 Ohio St.3d 136, paragraph two of the syllabus. See, also, Stricklandv. Washington (1984), 466 U.S. 668, 694. Any questions regarding the effectiveness of counsel must be viewed in light of the evidence against the defendant, State v. Bradley, supra, at 142, with a "strong presumption that counsel's conduct falls within the wide range of professional assistance." Strickland, 466 U.S. at 689; State v. Lytle
(1976), 48 Ohio St.2d 391, 397, vacated in part on other grounds, Lytlev. Ohio (1978), 438 U.S. 910, 98 S.Ct. 3135. An appellate court will not second-guess the strategic decisions of trial counsel. State v. Carter
(1995), 72 Ohio St.3d 545, 558, certiorari denied, 516 U.S. 1014. Hindsight may not be used to determine what was reasonable in light of trial counsel's perspective at the time. State v. Cook (1992),65 Ohio St.3d 516, 524-525, certiorari denied, Cook v. Ohio (1994),510 U.S. 1040.
Appellant initially argues that counsel erred in consenting to the admission of certain police reports which contained Bobbie Crispen's statements to the police. The record reveals, however, that appellant's counsel offered the reports into evidence, apparently as a way to contradict the officer's in-court testimony. With that in mind, we will now examine whether or not the introduction of these reports constituted ineffective assistance of counsel.
Portions of a police report which contain hearsay statements are inadmissible in evidence "unless offered by defendant." Evid.R. 803(8). Nonetheless, error in the admission of evidence is not grounds for reversal unless substantial rights of the complaining party were affected or it appears that substantial justice was not done. Evid.R. 103;O'Brien v. Angley (1980), 63 Ohio St.2d 159, 164-165. In determining whether a substantial right of a party has been affected, the reviewing court must decide whether the trier of fact would have reached the same decision had the error not occurred. See Hallworth v. Republic SteelCorp. (1950), 153 Ohio St. 349, 359.
In the present case, portions of the information contained in the reports regarding Crispen's statements did not stem from firsthand observation of the matters reported. Consequently, portions of the police reports pertaining to statements made by Crispen could have been stricken as not admissible. Nevertheless, none of the statements pointed out by appellant pertained to any violence perpetrated or threatened against Skyler. Chief Kimer, was cross-examined at trial as to the discrepancy between his testimony and the statement on the police report. Moreover, Crispen's credibility was challenged when Sergeant Sigsworth testified that she had lied about numerous issues on the day of Skyler's death.
Additionally, as noted previously, appellant's counsel may have introduced the records as a tactical move, to point out inconsistencies in either the deputy's testimony or in Crispen's statements. A complete review of the record reveals that had the inadmissible evidence been excluded, there was still sufficient competent evidence upon which the jury could have based its verdict. Therefore, we cannot say that the presentation of the police reports constituted ineffective assistance of counsel.
Next, contrary to appellant's assertion on appeal, appellant's trial counsel did, in fact, object to the admission of the statement read by Latonya Johnson and to certain hearsay statements by Dr. Babiuch. Therefore, counsel acted appropriately in regard to those statements. Based upon our determinations of appellant's other assignments of error and a complete review of the record, appellant has failed to establish that his counsel's representation fell below an objective standard of reasonableness.
Accordingly, appellant's sixth assignment of error is not well-taken.
 VII.
Appellant, in his seventh assignment of error, contends that the trial court erred in denying his motion to suppress evidence obtained from the partial search of the residence.
When determining a motion to suppress, a trial court becomes the trier of fact and is, therefore, in the best position to resolve questions of fact and to evaluate the credibility of witnesses. State v. Vance
(1994), 98 Ohio App.3d 56, 58; State v. Williams (1993), 86 Ohio App.3d 37,41. An appellate court must accept the findings of fact if they are supported by competent credible evidence. Id. Accepting those facts as true, the appellate court must "determine as a matter of law without deference to the trial court's conclusion, whether they meet the applicable standard." Id.
Warrantless searches are per se unreasonable unless made pursuant to consent. State v. Sneed (1992), 63 Ohio St.3d 3, 6-7, citing to UnitedStates v. Matlock (1974), 415 U.S. 164, 165-166. To rely on the consent exception of the warrant requirement, the state must show by "clear and positive" evidence that the consent was "freely and voluntarily" given.State v. Posey (1988), 40 Ohio St.3d 420, 427. Voluntariness is a question of fact to be determined from a totality of the circumstances.Id. A co-resident may give consent to search premises without violating another resident/defendant's constitutional rights. State v. Sneed,supra; State v. Greer (1988), 39 Ohio St.3d 236, 240.
In this case, on November 16, 1998, when the police saw the crack pipe on Skyler's bed, appellant had consented in writing to a search of the child's bedroom. Before consenting, appellant hesitated, concerned about some marijuana rolling papers being found. Moreover, once he was arrested, appellant did, in fact, briefly revoke consent. In our view, this indicates that appellant realized that he had a right to refuse consent to search. Beyond the mere presence of the investigating officers, nothing in the record indicates that appellant was under any duress or coercion inflicted by any of the officers. Furthermore, nothing else incriminating was found in the subsequent search done that day related to appellant's consent.
The next day, Bobbi Crispen consented to a search of the entire trailer and assisted officers in finding the hidden drugs and paraphernalia. The record supports that Crispen was a current resident of the trailer and, consequently, had authority to permit the police to search the premises. Thus, even presuming arguendo that appellant did not give consent, the search was valid based upon the permission granted to search the premises by a co-resident. Therefore, we conclude that, under the totality of the circumstances, consent was freely and voluntarily given and the trial court properly denied appellant's motion to suppress.
Accordingly, appellant's seventh assignment of error is not well-taken.
 VIII.
Appellant, in his eighth assignment of error, claims that the prosecution's conduct during closing statements constituted prejudicial error.
Both the prosecution and the defense have wide latitude during opening and closing arguments; questions as to the propriety of these arguments are generally left to the trial court's discretion. See State v. Loza
(1994), 71 Ohio St.3d 61, 78; State v. Brown (1988), 38 Ohio St.3d 305,317. Generally, a prosecutor's conduct at trial is not grounds for reversal unless that conduct deprives the defendant of a fair trial.Loza, supra. "The test for prosecutorial misconduct is whether the prosecutor's comments were improper and, if so, whether those remarks prejudicially affected the defendant's substantial rights." State v.Eley (1996), 77 Ohio St.3d 174, 187; State v. Lott (1990),51 Ohio St.3d 160, 165. A closing argument must be reviewed in its entirety to determine whether prejudicial effect occurred. State v.Frazier (1995), 73 Ohio St.3d 323, 342.
In this case, appellant's main complaint is with the prosecution's reference to Crispen's conviction as an indication that appellant was also guilty. In light of all the other evidence presented, we do not find that this comment was so improper as to prejudicially affect the outcome of the trial.
Accordingly, appellant's eighth assignment of error is not well-taken.
 IX.
Appellant, in his ninth assignment of error, contends that the admission of hearsay testimony by Dr. Babiuch, the emergency room doctor, was reversible error.
The admission or exclusion of evidence rests with the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173, 180. An abuse of that discretion indicates that the trial court's decision is arbitrary, unreasonable or unconscionable and is not merely an error of judgment. State v. Xie (1992), 62 Ohio St.3d 521, 527.
We note initially, that pursuant to Evid.R. 803(4), statements made for purposes of medical diagnoses or treatment are admissible as exceptions to the hearsay rule. In this case, the hearsay admitted was another doctor's statement, not the patient's doctor. The statement was not being used to diagnose and treat Skyler, but rather as evidence in an investigation as to the cause of death. Therefore, we cannot say that the statement falls within Evid.R. 803(4).
Nevertheless, R.C. 2151.421 requires any doctor, among others, who suspects child abuse to report it to the local child services agency or police. Along with the child's name and names of parents or custodians, the report shall include "the child's age and the nature and extent of the child's known or suspected injuries, abuse, or neglect or of the known or suspected threat of injury, abuse, or neglect, including anyevidence of previous injuries, abuse, or neglect" and "any otherinformation that might be helpful in establishing the cause of the knownor suspected injury, abuse, or neglect or of the known or suspectedthreat of injury, abuse, or neglect." Furthermore, as we have also noted previously, hearsay is an out-of-court statement offered "to prove the truth of the matter asserted." Evid.R. 801(C).
In our view, the family doctor's statement was not admitted for the truth of the matter asserted, i.e., that Skyler had never been abused, but rather as information incident to Dr. Babiuch's review of the trauma team's efforts and the statutorily required duty to report child abuse. As such, the information is irrelevant to determining the perpetrator of the incidents which occurred on the day of Skyler's death.
Even presuming, however, that the admission of the statement constituted error, we cannot say that it was prejudicial to appellant's case. Since Dr. Kale (whose comments were reported by Babiuch) had not seen Skyler for about a year, it is pure speculation that the jury concluded that Skyler had never been abused until moving in with appellant. In fact, with information about Crispen's drug usage, the jury could have concluded that Skyler may have been abused prior to moving in with appellant and was simply not taken to the doctor. Therefore, we cannot say that the admission of the family doctor's statement to Dr. Babiuch constituted reversible error.
Accordingly, appellant's ninth assignment of error is not well-taken.
The judgment of the Erie County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.
JUDGMENT AFFIRMED.
James R. Sherck, J., Richard W. Knepper, J., Mark L. Pietrykowski,P.J., JUDGES CONCUR.